IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DISNEY ENTERPRISES, INC.,            )
                                     )
            Plaintiff,               )
                                     )
     v.                              )
                                     )
DAVID KAPPOS, Honorable Under        )        1:12cv687 (LMB/TRJ)
   Secretary of Commerce for         )
   Intellectual Property and         )
   Director of the United States     )
   Patent and Trademark Office,      )
                                     )
            Defendant.               )

F I L E D
FEB 11 2013
CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

Before the Court are the plaintiff's First and Second
Motions in Limine, the defendant's Motion in Limine, and the
defendant's Motion for Partial Summary Judgment, or in the
Alternative, for a Remand.  For the reasons that follow and as
stated in open court, the plaintiff's two Motions in Limine will
be denied, the defendant's Motion in Limine will be granted, and
the defendant's Motion for Partial Summary Judgment or, in the
Alternative, for a Remand will be denied by an appropriate Order
to accompany this Memorandum Opinion.

## I.    BACKGROUND

On February 21, 1996, Steven T. Kirsch ("Kirsch"), with
assignee Infoseek Corporation, filed a patent application that
resulted in the issuance of United States Patent No. 5,963,915
("the '915 patent") on October 5, 1999.  See Administrative

Record ("A.R.") at 1-3, 44-46, 189-97. Almost exactly two years later on October 4, 2001, Kirsch, again with assignee Infoseek Corporation, filed Application No. 09/970,772 ("the '772 application"), which sought reissue of the '915 patent pursuant to 35. U.S.C. § 251. A.R. at 136, 138, 140. Around August 2006, Infoseek assigned all interest in the '915 patent and in the pending '772 application to the plaintiff, Disney Enterprises, Inc. ("Disney"). A.R. at 114-16, 1375-78.

After extensive prosecution of the '772 application before the United States Patent and Trademark Office ("USPTO"), the examiner issued a final rejection of all of the '772 application's pending claims on April 6, 2011. A.R. at 2900. The primary independent claims in the '772 application were rejected as being unpatentable over United States Patent No. 5,708,780 (the "Levergood patent") because of obviousness in view of admitted prior art in the '915 patent and further in view of United States Patent No. 5,732,219. A.R. at 2903.

Disney appealed this rejection to the Board of Patent Appeals and Interferences[1] ("the Board") on April 13, 2011. A.R. at 2938. The Board affirmed the examiner, and denied Disney's subsequent request for rehearing. A.R. at 3024-26, 3050-53. On

---

[1] The Leahy-Smith America Invents Act changed the name of this body from the "Board of Patent Appeals and Interferences" to the "Patent Trial and Appeal Board," effective as of September 16, 2011. Pub. L. No. 112-29, 125 Stat. 284.

June 22, 2012, Disney filed this civil action pursuant to 35 U.S.C. § 145, alleging that the Board erred when it concluded that the pending claims in the '772 application would have been considered obvious under 35 U.S.C. § 103, and seeking a judgment that it is entitled to a reissue patent for the inventions defined by the pending claims in the '772 application. Compl. ¶¶ 1, 23-24. A bench trial is scheduled for February 12, 2013.

## II. DISCUSSION

### A. USPTO's Motion in Limine

In its Motion in Limine, the USPTO argues that the expert opinion of David Geller, Disney's expert witness, on the source code in the Levergood patent was untimely produced and accordingly seeks to preclude Disney from introducing any evidence regarding that source code. Specifically, it seeks to preclude Mr. Geller from testifying about his conclusions regarding the expiration attribute of the session identification (SID) based on that source code and the documents labeled DISNEY01532-35.

The Court issued a Scheduling Order on August 23, 2012, which required the parties to complete discovery by December 14, 2012. Dkt. No. 10. On September 10, 2012, a magistrate judge approved the discovery plan submitted by the parties. Dkt. No. 12. That discovery plan provided that Disney would serve its opening expert disclosures on or before October 15, 2012, that

the USPTO would serve its responsive expert disclosures on or before November 14, 2012, and that plaintiffs would serve any rebuttal expert disclosures on or before November 30, 2012. Dkt. No. 11. That schedule was later amended to allow a few days of additional time for each expert report to be served. Dkt. Nos. 5, 24, 25.

On October 18, 2012, Disney served the USPTO with Mr. Geller's expert report. See Decl. of David Geller [Dkt. No. 44], Ex. A ("Geller Expert Report") at 5. In his report, Mr. Geller did not expressly analyze the code in the Levergood patent, focusing on the patent's specification, with only brief references to the expiration attribute of the SID. See id. at 45 (quoting description of the SID but highlighting the accessible domain and IP address elements, not the expiration time); id. at 48 (quoting Levergood explanation of validation that includes expiration time, but emphasizing IP address and domain fields).

The USPTO responded with the report of Glenn Weadock, its expert, on November 21, 2012. See Mem. of Law in Supp. of Def.'s Mot. in Limine to Preclude Introduction of Evidence Concerning Pl.'s Untimely Expert Opinions [Dkt. No. 35], Ex. 1 ("Weadock Expert Report") at 8. Mr. Weadock wrote in his expert report that the SID taught in the Levergood patent has an "expires" attribute that "ranges from 1 to 256 hours," meaning

4

that "the maximum value would be 10 days and 16 hours," and
accordingly "would be considered by a person of skill to have
some degree of persistence, and also to be intended for storage
and re-use, given that the typical browser session is much less
than 10 days and 16 hours." Id. at 23; see also id. at 31
("Levergood never defines precisely what he means by a
'session,' but if the SID were never to be stored and re-used,
it is not clear why it would need an expiration flag that could
extend beyond 10 days, as Levergood teaches."); id. at 28
("Levergood's SID also includes the attribute of an expiration
date.").

In his Reply Expert Report, which was served on December 7,
2012, fourteen days after the Weadock report was disclosed, Mr.
Geller responded to the statements regarding the expiration
attribute by stating:

> 20. For example, Mr. Weadock argues that a SID is
> persistent because an [sic] SID may have an expiration
> date value of between 1 and 256 hours. . . . He reaches
> this conclusion by performing a calculation based on the
> size of the expiration date field (16-bit), and the
> observation that the SID is a sixteen character ASCII
> string that encodes 96 bits of data, with 6 bits of data
> per character. . . . Mr. Weadock did not reveal any of
> the calculations he used to arrive at his conclusion
> that the maximum value of the expiration field in the
> SID is 256 hours, so I cannot independently validate
> this conclusion.
>
> 21. Ultimately, the fact that the maximum theoretical
> value of the 16-bit date field SID of the [sic] could be
> "256" (~10.6 days according to Mr. Weadock) is
> irrelevant. This is because there is nothing in

5

Levergood suggesting that this maximum theoretical SID expiration date value is ever used in the Levergood scheme.

22. Despite this, Mr. Weadock theorizes that because a SID could have this maximum theoretical value, it must mean the SID is being used as a persistent identifier. . . .

23. Mr. Weadock overlooks two simple, and more logical explanations for the inclusion of a date field in the SID. First, it is true that the SID is "re-used" in the Levergood scheme. Mr. Weadock, however, doesn't comment on how the SID is actually re-used in the Levergood scheme. As I explained in my opening report, the SID is re-used during a session – it is appended to each URL sent between the client browser and the Web server.

24. Second, the more logical use of the date field is to regulate how long within a session the SID will be valid. This was an obvious function of the SID in the types of session being envisioned in the Levergood system, which could have a varying duration.

Decl. of David Geller [Dkt. No. 44], Ex. B ("Geller Reply Expert Report") at 10-11 (emphasis added); see also id. at 12 ("The theoretical maximum period of 256 hours he calculates for the expiration date field value in the SID is simply the consequence of the size of the data block in the SID. Thus, the fact that a SID may have a theoretical maximum value of 256 . . . means nothing."). The only time that Mr. Weadock's conclusion as to the length of time that may pass before the SID expires has any relevance in Mr. Geller's Reply is when he observes:

36. Also, based on Mr. Weadock's own characterization of how long SIDs may exist, his suggestion that the use of the Levergood system to enable access by a subscriber to a journal subscription makes no senses [sic]. According to Mr. Weadock, the maximum degree of

persistence that a SID could theoretically have would be 10 days and 16 hours. . . . In addition, Mr. Weadock is suggesting the "persistent" SID is being used to gain access to the user's [journal] subscription account. Most journal subscriptions concern periodicals that are issued weekly or monthly. A SID that last [sic] only 10 days and 16 hours would have little value, for example, in gaining access on an ongoing basis to a periodical that is issued weekly or monthly.

Id. at 15. Nowhere in his Reply Report, however, did Mr. Geller discuss the source code included in the Levergood patent, nor did he indicate in any respect that he had considered or relied upon an analysis of that code.

On December 11, 2012,[2] the parties took Mr. Weadock's deposition. See Def.'s Mot. in Limine, Ex. 6 ("Weadock Dep.") at 1. Near the beginning of the deposition, Mr. Weadock testified on direct that he had become aware of a mathematical error in his report; specifically, that he had miscalculated the maximum potential value for the expiration attribute to be 256 when the correct number was 65,536. See id. at 9:17-10:13. Accordingly, his new calculation of the maximum value was seven and a half years instead of 10 and a half days. Id. at 10:14-21.

---

[2] According to the USPTO, Mr. Weadock first realized his error on December 9, 2012, and the USPTO's attorneys learned about it on December 10, 2012. Reply Mem. of Law in Supp. of Def.'s Mot. in Limine to Preclude Introduction of Evidence Concerning Pl.'s Untimely Expert Opinions ("Def.'s Mot. in Limine Reply") at 6-7 & n.3.

At 8:34 p.m. on December 12, 2012, the day before Mr. Geller's scheduled deposition, Disney, without explanation, e-mailed to the USPTO new documents, including some source code and screenshots of a computer terminal executing that code. See Def.'s Mot. in Limine, Ex. 7. During his deposition on December 13, 2012, Mr. Geller testified that the computer code in the Levergood patent "suggests that the storage value in [the expiration attribute] are stored in seconds," id., Ex. 8 ("Geller Dep.") at 91:24-25, and therefore the maximum expiration "would be 65,535 seconds," id. at 104:2-3, or a little over 18 hours. The USPTO objected to these late-produced documents and new opinions. Id. at 95:7-25, 98:15-18. At 6:20 p.m. on Friday, December 14, 2012, the date that discovery was set to close, Disney served Mr. Geller's supplemental expert report. Def.'s Mot. in Limine, Ex. 9.

On December 19, 2012, the USPTO sent Disney a letter requesting that it withdraw Mr. Geller's untimely expert opinions about the expiration attribute. Id., Ex. 10. Disney responded by letter on December 20, 2012, indicating that Mr. Geller's additional opinions were directly responsive to Mr. Weadock's revision of his estimate of the expiration time and that Disney did not believe the opinions were untimely but instead were proper supplementation under Rule 26(e). Id., Ex. 11. Disney further contended that the USPTO was not prejudiced

because it was able to cross-examine Mr. Geller about these opinions at his deposition, and that if anyone was prejudiced it was Disney because "the USPTO . . . failed to convey to Disney by any means the substantial change in Mr. Weadock's opinions until after Mr. Weadock's deposition began." Id. at 2-3 (emphasis in original). Disney "[n]onetheless" offered the USPTO an opportunity "for a further limited examination of Mr. Geller on the documents that were produced on December 12, 2012 and the subject matter of his supplemental expert report." Id. at 4.[3]

Disney's arguments are unavailing. Mr. Geller's opinions regarding the expiration attribute in the code were not in response to Mr. Weadock's revision of his estimate, and indeed Mr. Geller so testified at his deposition:

> Q. So it's only after you read [Mr. Weadock's deposition correcting his math], that you then did this analysis?
> A. No, I didn't say that. You were just asking about Weadock's comments about that, and I just made a note about that. I wasn't suggesting that my analysis or review of the code took place after that or because of that.

---

[3] The USPTO alleges that this "offer was nothing more than a thinly-veiled attempt to appear reasonable so that it could make the exact argument it now makes," and that "it would have been virtually impossible to schedule a second deposition of Mr. Geller within the confines of the Court's schedule – a schedule of which Disney was well aware at the time it made its so-called 'offer.'" Def.'s Mot. in Limine Reply at 7; see also Def.'s Mot in Limine at 15-16.

Geller Dep. at 94:25-95:6. Moreover, Mr. Geller did not confirm

that his analysis was in response to Mr. Weadock's changed

opinion even when explicitly asked by Disney's counsel:

> Q. And you did that analysis [of the C code in the
> Levergood patent] -- some of that analysis last night?
> A. Correct.

> MS. LYNCH: Objection. Leading.
> BY MR. CHOI:

> Q. Now was that work done, at least in part, as a
> response to Mr. Weadock's change in his expiration date
> number?

> MS. LYNCH: Objection. Leading.

> WITNESS: The impetus for doing that was really so I
> had a much firmer understanding of a specific piece of
> the Levergood patent, and I wanted to confirm that.

> BY MR. CHOI:
> Q. But you wanted to confirm that, at least in part,
> because Mr. Weadock had changed his conclusions
> regarding that number during his deposition, correct?

> MS. LYNCH: Objection. Leading. Coaching the witness.
> Argumentative.

> WITNESS: You know, I think it's -- the analysis
> stands, regardless of Mr. Weadock's mistake. So it was
> certainly helpful to run the exercise in light of that,
> but it was not -- it didn't change my analysis.

Id. at 174:13-175:11. But see Def.'s Mot. in Limine, Ex. 9

(Supplemental Expert Report of David Geller) at 2 ("I submit

this supplemental expert report after having reviewed the

December 11, 2012 deposition transcript of the Government's

expert, Mr. Glenn Weadock, which was not available to me when I

prepared my October 18, 2012 and December 7, 2012 expert

reports."); id. at 3 ("The dramatically altered value for the
SID Mr. Weadock calculated in his deposition prompted me to
review the source code in Levergood again." (emphasis added)).
From these statements, it appears that Mr. Geller had been
reviewing the Levergood source code before Mr. Weadock changed
his calculations.  Because discussion of the expiration
attribute was clearly revealed in Mr. Weadock's expert report,
Mr. Geller had two weeks to consider that discussion and should
have included any rebuttal, including an analysis of the
Levergood code if appropriate, in his reply report.  Instead, in
his reply report, he argued that the expiration attribute was
irrelevant and simply noted that "Mr. Weadock did not reveal any
of the calculations he used to arrive at his conclusion that the
maximum value of the expiration field in the SID is 256 hours,
so I cannot independently validate this conclusion."  See Geller
Expert Reply Report at 10-12.

Although Mr. Geller's supplemental expert report and
additional documents were produced during the discovery period,[4]
they were not timely because they were produced after the
deadlines for expert disclosures set by the parties' discovery
schedule.  Moreover, they were not merely "supplemental" under
Fed. R. Civ. P. 26(e).  A party's "clear obligation to disclose

---

[4] As stated above, Mr. Geller's supplemental expert report was
produced on December 14, 2012, the last day of the discovery
period, after the close of business at 6:20 p.m.

11

and supplement expert witness information in a timely
fashion . . . does not permit a party to make an end-run around
the normal timetable for conducting discovery." East West, LLC
v. Rahman, No. 1:11cv1380, 2012 WL 4105129, at *6 (E.D. Va.
Sept. 17, 2012) (quoting Colony Apartments v. Abacus Project
Mgmt, Inc., 197 Fed. App'x 217, 231 (4th Cir. 2006)) (internal
quotation marks omitted). Accordingly, "[c]ourts distinguish
true supplementation (e.g., correcting inadvertent errors or
omissions) from gamesmanship, and have therefore repeatedly
rejected attempts to avert summary judgment by supplementing an
expert report with a new and improved expert report." Id.
(quoting Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d
624, 631 (E.D.N.C. 2008)). Mr. Weadock's revised opinion was an
attempt to correct a mathematical error; Mr. Geller's
supplemental analysis, which for the first time referenced the
source code in the Levergood patent, could have and should have
been made in his reply report before Mr. Weadock's revised
opinion was known. Cf. id. at *7 ("This Court finds that,
despite Defendants' characterization of the instant report as
supplementation, the document contains new information and
expert opinion, intended both as an expansion of their earlier
expert report as well as a means to impermissibly broaden the
scope of the expert opinions that Defendants seek to admit.").
Lastly, during oral argument Disney admitted that it never

overtly referenced the computer code in the Levergood patent in any of the proceedings before the examiner or the Board. Raising the source code, which is described as written in the C language, at such a late date clearly put the USPTO at a great disadvantage and, among other issues, is one of the bases Disney is using in its motion to disqualify the defense expert. See Pl. Disney's Br. Supporting Its Mots. in Limine ("Pl.'s Mots. in Limine") at 1-2, 22-23.

A court has "broad discretion" to determine whether an untimely discovery disclosure is substantially justified or harmless under Fed. R. Civ. P. 37(c)(1). See, e.g., S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). In determining whether to exclude untimely expert disclosures in particular, a court should consider:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Id. Although the USPTO did have an opportunity to cross-examine Mr. Geller about his "supplemental" opinion, it was clearly surprised by this new evidence. Disney's explanations for its failure to timely disclose the new opinions are not satisfactory. Accordingly, the Court declines to find that Disney's untimely disclosure of Mr. Geller's "supplemental"

opinion relying on the source code to discuss the expiration attribute was substantially justified or harmless and will grant the USPTO's motion to preclude him from testifying about that opinion at trial.

At oral argument, Disney cited longstanding Federal Circuit precedent requiring an obviousness analysis to consider each prior art reference "in its entirety." Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 448 (Fed. Cir. 1986). Counsel argued that because the source code in the Levergood patent, included without explanation or context, makes up "more than 80% of the disclosure of the Levergood patent," Pl. Disney's Reply Br. in Supp. of Its Mots. in Limine ("Pl.'s. Mots. in Limine Reply") at 2 (emphasis in original), granting the USPTO's motion in limine will prejudice its ability to make its case. This argument does not persuade the Court.

The Supreme Court recently held that a civil action in district court brought under 35 U.S.C. § 145 is to be "conducted according to the ordinary course of equity practice and procedure" and accordingly, disappointed applicants are "free to introduce new evidence in § 145 proceedings subject only to the rules applicable to all civil actions, the Federal Rules of Evidence and the Federal Rules of Civil Procedure." Kappos v. Hyatt ("Hyatt II"), 132 S. Ct. 1690, 1699-1700 (2012). Accordingly, if Disney wanted to rely on Mr. Geller's analysis

14

of the source code in the Levergood patent regarding the
expiration attribute, it should have produced that opinion in
accordance with the discovery schedule to which it agreed.
Because it failed to do so, Disney will not be allowed to adduce
those opinions and evidence at trial.

## B. Disney's Motions in Limine

### 1. Disney's First Motion in Limine

In Disney's first Motion in Limine, it seeks to preclude
Mr. Weadock, the USPTO's expert witness, from offering an expert
opinion on what the Levergood patent discloses and whether it
would have made the claims in the '772 patent obvious to a
person of ordinary skill in the art in February 1996. See Pl.
Disney's Br. Supporting Its Mots. in Limine ("Pl.'s Mots. in
Limine") at 1. Specifically, Disney notes that the Levergood
patent "contains over 100 columns of computer source code
written in the C programming language," and that Mr. Weadock
admits that he has essentially no knowledge of that language.
On that basis, Disney argues that he is "incapable of accurately
describing what the Levergood patent discloses." Id. Disney
further argues that Mr. Weadock "lacks any specialized knowledge
that would enable him to present reliable or relevant testimony
about what a person of ordinary skill in the art would have
concluded after reviewing the Levergood patent in February of
1996" because the field of the invention is "web-related

software development," but Mr. Weadock was not "a Web computer programmer in February of 1996," and is thus "incapable of presenting reliable or relevant testimony on what [a person of ordinary skill in the art] would have believed." Id. at 2-4.

The USPTO responds that Disney never relied on the C code in Levergood during the prosecution of the '772 patent before the USPTO, in its opening expert report, or in its reply expert report, and therefore "Disney's belated position about the connection between the C programming language and the art at issue here is nothing more than a thinly-veiled attempt to redefine the relevant technical field in such a way to exclude Mr. Weadock." Def.'s Mem. of Law in Opp'n to Pl.'s Mots. in Limine ("Def.'s Mots. in Limine Opp'n") at 9. It further argues that Mr. Weadock's alleged error about the expiration date is irrelevant, id. at 12-14, and that Disney's argument that Mr. Weadock is not qualified because he was not a web developer in February 1996 is based on an incorrect legal premise because "[a]n expert witness does not have to be one of ordinary skill in the art at the time of the invention, and the expert's knowledge and experience gained after the time of the invention is relevant to determining the expert's qualifications," id. at 14-15.

Disney contends in its reply that Mr. Weadock's "inability to understand the source code in Levergood . . . means that his

16

level of skill is <u>below</u> that presumed by the Federal Circuit to be possessed by the person of ordinary skill in the art," and he "is thus unqualified to provide any opinions, much less <u>expert</u> opinions, about the Levergood patent, and his testimony must be excluded." Pl.'s Mots. in Limine Reply at 6 (emphasis in original). Further, Disney contends that the source code is an "[i]ntegral [p]art" of the patent, despite the absence of any overt references to it in any of the administrative proceedings or in its first two expert reports. <u>Id.</u> at 6-7. Disney's attempt to get around the administrative record by arguing that "there is also no indication on the record that the source code was <u>not</u> actually considered during prosecution before the [US]PTO and the appeal to the Board," and that "[a]n equally plausible inference is that the source code was, in fact, considered by those involved in the prosecution of the '772 application" is pure speculation. <u>Id.</u> at 8-9 (emphasis in original). Moreover, Disney's effort to have this Court ignore the administrative record is not supported by <u>Hyatt II</u>, which explicitly allows the district court to "consider the proceedings before and findings of the Patent Office in deciding what weight to afford an applicant's newly-admitted evidence." 132 S. Ct. at 1700 (quoting <u>Hyatt v. Kappos</u> ("<u>Hyatt I</u>"), 625 F.3d 1320, 1335 (Fed. Cir. 2010) (en banc)) (internal quotation marks omitted).

Admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of expert testimony bears the burden of establishing the admissibility of the testimony by a preponderance of the evidence. See Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001). In patent cases, a witness who is not qualified as a person of ordinary skill in the pertinent art may not testify as an expert on obviousness. Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1364 (Fed. Cir. 2008).

Disney's opening expert report included no discussion of what constitutes a person of ordinary skill in the art. See Geller Expert Report. In the USPTO's responsive expert report, Mr. Weadock stated that in his opinion, a person of ordinary skill in the art during the "1995-96 timeframe" was a person with "an undergraduate degree in computer science or a related

discipline (or equivalent work experience) and would have worked with Internet or Web networking technologies for at least one year." See Weadock Expert Report at 20. In his reply expert report, Mr. Geller "agree[d] with most of Mr. Weadock's definition," but he was not sure which "Internet or Web networking technologies" Mr. Weadock was referencing, and he stated that "relevant experience would have involved Web development and the use of Web-based tools to solve problems associated with the open network model embodied by the Internet, and Internet-based software applications," not proprietary systems that were "used to set up local Intranets." Geller Reply Expert Report at 38. It was not until his deposition that Mr. Geller added that "the person of ordinary skill would've been a C programmer." Geller Dep. at 193:5-7.

According to the Levergood patent's specification, despite the unexplained presence of several pages of source code written in what appears to be the C programming language, "[t]he present invention relates to methods of processing service requests from a client to a server through a network." Levergood patent at 3:7-8 (emphasis added). Nowhere in the patent does it indicate that the C programming language must be used. Moreover, the specification of the '915 patent, which is identical to the specification of the '772 application, describes the "[f]ield of the [i]nvention" as being "generally related to systems of

19

performing commercial activities over a general access computer
network and, in particular, to a system and method of
conveniently and efficiently performing advertising responsive
secure commercial purchase transactions over the Internet
utilizing the World Wide Web." '915 patent at 1:24-29. It also
does not state that the C programming language, or any specific
programming language, must be used.

Disney cites several examples of places within the
specifications that discuss modifications to source code and
argues that the field of the invention is "[w]eb-[r]elated
[s]oftware [d]evelopment" and accordingly "a person of ordinary
skill in the art would have been someone who could develop Web-
based software, and was part of the Web software development
community in February of 1996." See Pl.'s Mots in Limine at 19-
21. There is no indication in the Levergood patent or in the
'772 specification that only a person fluent in the C
programming language could develop Web-based software.
Accordingly, the Court finds that expertise in the C programming
language is not required to be "a person of ordinary skill in
the art."

Mr. Weadock received a bachelor of science in general
engineering from Stanford University in 1980. Def.'s Mots. in
Limine Opp'n, Ex. 2, at PTO-000012. As part of obtaining that
degree, he took classes in computer science, including one or

two on FORTRAN programming.  Id., Ex. 1, at 20:6-17.  He took further classes in computer science after graduation, including classes on Pascal, Visual Basic, and Applesoft BASIC.  Id. at 21:6-22:3.  He also attended "many classes and seminars . . . on computer programming and networking and, later, internet classes."  Id. at 22:13-15.  He worked at a solar energy company, where he wrote data acquisition and billing software in BASIC and Pascal; he consulted for an oil and gas company and wrote a royalty calculating and reporting application in Applesoft BASIC; and he wrote database programs for a travel magazine and for a credit collection agency.  Weadock Expert Report at 6.  Although he may not have expertise in the C programming language, these activities establish that he has significant experience programming in other languages.

Mr. Weadock also started his own company, Independent Software, Inc., through which he "has been involved in many different activities focused on the fields of computer networking, Web technology, Internet browsers, and computer security."  Def.'s Mots. in Limine Opp'n at 5.  Around the time of 1996, he was working on publishing a book titled Intranet for Dummies, and as part of his preparation he "created websites" that were deployed on private networks.  Id., Ex. 1, at 40:14-41:9, 62:6-10.  After February 1996, he was hired at least once to produce a website for a company.  Id. at 49:24-50:7.  He has

also constructed a website for a pianist that supports commercial transactions through links to PayPal. Id. at 65:13-22. Mr. Weadock accordingly does have experience with public Internet technologies, as well as with Intranet technologies, which if not identical (for example in terms of security concerns) are at least similar to the technologies at issue in this litigation.

Moreover, as the USPTO correctly points out, an "expert must be qualified to testify about what a person with ordinary skill in the art must have understood at the time of the invention, but the expert's knowledge of that may have come later." Baldwin Graphic Sys., Inc. v. Siebert, Inc., 2006 WL 3718074, at *1 (N.D. Ill. Dec. 14, 2006). That Mr. Weadock may not himself have been a member of the web community in 1996 does not preclude his testimony.

The cases cited by Disney in support of its motion are inapposite because they address vastly more attenuated relationships between the expertise of the purported experts and the field of the inventions than the circumstances before this Court. For example, in Sundance, the Federal Circuit held that a patent attorney with experience in patent law and procedure did not have sufficient technical expertise to testify about whether a "retractable segmented cover system used with a truck trailer" was obvious in light of prior art references. 550 F.3d

at 1358, 1360-65; see also id. at 1362 (observing that the
expert "has no experience whatsoever in 'the field of tarps or
covers,'" and the proponent of his testimony did not even
purport that his "experience with engines and the like is
sufficiently related to covers"). In Flex-Rest, LLC v.
Steelcase, Inc., the Federal Circuit found no abuse of
discretion in the exclusion of an ergonomics expert's testimony
when the district court had "found that one skilled in the art
was a keyboard designer." 455 F.3d 1351, 1360 (Fed. Cir. 2006).
Similarly, the Federal Circuit in Extreme Networks, Inc. v.
Enterasys Networks, Inc. found no abuse of discretion in the
exclusion of an expert's testimony when that expert did not meet
her own description of a person of ordinary skill in the art.
395 F. App'x 709, 715 (Fed. Cir. Sept. 30, 2010) ("Both parties
agree that a person of ordinary skill in the art . . . would
have a substantial background in switches, bridges, and
routers. . . . [The expert] worked as a system administrator for
several corporations, but she never seems to have worked on 'the
design or development of high speed switches, bridges, or
routers.'"). Most obviously, in Williamson ex rel. At Home
Bondholders' Liquidating Trust v. Verizon Communications Inc.,
where "the patents-in-suit describe the invention as 'a
scalable, hierarchical, distributed network architecture and
processes for replicating, caching, and multicasting,'" the

district court excluded the testimony of a proposed expert who
held "no technical degree, ha[d] never completed coursework in
any technical field, and ha[d] never actually designed computer
networks," and who was "unable, at his deposition, to describe
basic networking principles," or "to explain the components of a
network." 2012 WL 5425033, at *2 (S.D.N.Y. Nov. 7, 2012). In
this instance, Mr. Weadock has had computer science training
both as part of his undergraduate degree and in post-graduate
coursework, and further has experience in constructing websites
and in other aspects of Internet technology.

Finally, to the extent there are any concerns about Mr.
Weadock's expertise, this proceeding will be a bench trial and
accordingly "[t]he gatekeeping function of the court is
relaxed." Traxys N. Am., LLC v. Concept Mining, Inc., 808 F.
Supp. 2d 851, 853 (W.D. Va. 2011). Disney's arguments about Mr.
Weadock's qualifications are more appropriately addressed to the
weight of his opinions, rather than to their admissibility. For
these reasons, Disney's first Motion in Limine will be denied.

2. Disney's Second Motion in Limine

In its second Motion in Limine, Disney seeks to prohibit
the USPTO from offering three of its proposed exhibits at trial
and to preclude the USPTO's expert from testifying about those
exhibits at trial because the exhibits were published after the
time of the invention, February 1996, and because no evidence

has been introduced establishing that the information in them was known before that time. Id. at 28-29. The exhibits at issue are:

- USPTO's Proposed Exhibit 15: Stephen Genusa, Special Edition Using ISAPI-Chapter 2 (the "ISAPI article"), published in August 1996;

- USPTO's Proposed Exhibit 19: An excerpt from Gordon McComb, Javascript Sourcebook, published in March or August 1996; and

- USPTO's Proposed Exhibit 22: Chapter 8 from Nancy J. Yeager & Robert E. McGrath, Web Server Technology, published in July 1996.

See Def.'s Mem. of Law in Opp'n to Pl.'s Mots. in Limine ("Def.'s Opp'n to Mots. in Limine") at 19; Pl.'s Mots. in Limine at 29.

In support of its argument, Disney cites Federal Circuit precedent that requires courts assessing obviousness to "analyze[] the prior art and understanding of the problem at the date of invention." Mintz v. Dietz & Watson, Inc., 679 F.3d 1372, 1379 (Fed. Cir. 2012); see also Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1380 n.4 (Fed. Cir. 1986) ("[O]bviousness must be determined as of the time the invention was made."). It further cites authority establishing that printed publications constitute prior art only when published before the claimed invention was made. See 35 U.S.C. § 102; see also Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1576 (Fed. Cir. 1996) ("[A] document is prior art only when published

25

before the invention date."); Hybritech v. Monoclonoal Antibodies, Inc., No. C-84-0930 MHP, 1987 U.S. Dist. LEXIS 16937, at *8-9 (N.D. Cal. May 19, 1987) (finding that articles "are not prior art . . . because they are dated . . . well after the date of invention"). Because the three exhibits at issue were published after the invention date of February 1996, Disney argues that they must be excluded. See Pl.'s Mots. in Limine at 29. The USPTO counters that it is not seeking to use the exhibits as prior art, but "only to demonstrate the state of the art among ordinarily skilled artisans at the time of invention." Def.'s Opp'n to Mots. in Limine at 21.

An obviousness analysis requires consideration of "the scope and content of the prior art . . .; differences between the prior art and the claims at issue . . .; and the level of ordinary skill in the pertinent art," as well as secondary considerations, including "commercial success, long felt but unsolved needs, [and] failures of others." Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17 (1966); see also KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 418 (2007) ("Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent

reason to combine the known elements in the fashion claimed by the patent at issue."). Under the USPTO's published guidelines concerning how its examiners are to conduct that obviousness analysis, examiners must "ensure that the written record includes findings of fact concerning the state of art and the teachings of the references applied," and in certain circumstances should "include explicit findings as to how a person of ordinary skill would have understood prior art teachings, or what a person of ordinary skill would have known or could have done." Examination Guidelines for Determining Obviousness Under 35 U.S.C. 103 in View of the Supreme Court Decision in KSR International Co. v. Teleflex Inc., 72 Fed. Reg. 57526, 57527 (Oct. 10, 2007).

Accordingly, the state of the art around the time of the invention is relevant to the obviousness analysis. Publications published after the date of invention have long been allowed "as evidence of the state of the art existing on the filing date of an application." In re Hogan, 559 F.2d 595, 605 & n. 17 (C.C.P.A. 1977); see also In re Epstein, 32 F.3d 1559, 1563, 1567 (Fed. Cir. 1994) (finding "no clear error" in the Board's fact finding that writings dated after the filing date demonstrated the level of skill in the art at the time of the invention); Thomas & Betts Corp. v. Litton Sys., Inc., 720 F.2d 1572, 1580-81 (Fed. Cir. 1983) (finding that although

unpublished internal documents were "not technically prior art," they "were, in effect, properly used as indicators of the level of ordinary skill in the art to which the invention pertained"). Moreover, the publications the USPTO seeks to use as evidence of the state of the art around the time of the invention were all published within one to six months after February 1996. As the USPTO argues, "common sense" dictates that the content of these articles must have been developed around the time of the invention if not before. See Def.'s Opp'n to Mots. in Limine at 20-21.

For these reasons, the Court finds the publications to be relevant to understanding the state of the art in the February 1996 time period and will deny Disney's second Motion in Limine.

## C. USPTO's Motion for Partial Summary Judgment or Remand

The USPTO argues that Disney's expert's reports raise "a new issue that Disney never raised to (and indeed, directly contradicts a position Disney took before) the Board of Patent Appeals and Interferences." Mem. of Law in Supp. of Def.'s Mot. for Partial Summ. J., or in the Alternative, for a Remand at 1-2. Specifically, the USPTO argues that Mr. Geller's opinion that the SIDs in Levergood are not persistent conflicts with Disney's position before the Board and accordingly that Disney "is precluded from raising new issues in a section 145 action"

because "Disney is bound by the admissions it made to the Board and in its complaint." Id. at 2.

Disney counters that the motion "asks this Court to ignore the Supreme Court's Hyatt decision, and to improperly limit the scope of admissible evidence to that relating only to the specific arguments Disney made before the Board." Pl. Disney's Corrected Br. in Opp'n to Def.'s Mot. for Partial Summ. J., or in the Alternative, for a Remand at 2. Disney's position is that "pre- and post-Hyatt jurisprudence makes it crystal clear that a patent applicant is entitled to address issues raised at any point during the proceedings before the [US]PTO – both before the [US]PTO Examiner and before the Board." Id. (citing Hyatt I, 625 F.3d at 1337-38) (emphasis in original). Further, Disney contends that the "issue" in this § 145 civil action is "whether the Levergood patent, considered from the view of a person of ordinary skill in the art, would have made obvious the claims of the '772 application." Id. at 3 (citing BTG Int'l Ltd. v. Kappos, No. 1:12cv682, 2012 WL 6082910, at *6 (E.D. Va. Dec. 6, 2012)). Finally, Disney argues that "[a] review of the administrative record shows that Disney made no 'express and unequivocal' statements that rise to the level of a judicial admission." Id. at 4.

The en banc decision of the Federal Circuit in Hyatt I stated that "[i]ssues that were not considered by the [USPTO]

cannot be raised with the district court in most circumstances, and if no new evidence is introduced, the court reviews the action on the administrative record, subject to the court/agency standard of review." 625 F.3d at 1322; see also id. at 1337 ("We have held that, in general, parties may not raise issues in the district court that were not raised during the proceedings before the [USPTO] or by the Board's final decision." (emphasis added)). This "waiver" doctrine was not addressed in Hyatt II, in which the Supreme Court affirmed the en banc decision of the Federal Circuit. See generally Hyatt II, 132 S. Ct. 1690; cf. id. at 1702 (Sotomayor, J., concurring) ("I do not understand today's decision to foreclose a district court's authority, consistent with 'the ordinary course of equity practice and procedure,' to exclude evidence 'deliberately suppressed' from the [US]PTO or otherwise withheld in bad faith." (citations and internal quotation marks omitted)).

The Supreme Court has held that "there are no evidentiary restrictions beyond those already imposed by the Federal Rules of Evidence and the Federal Rules of Civil Procedure" in § 145 actions. Hyatt II, 132 S. Ct. at 1694; cf. id. at 1696 ("We also conclude that the principles of administrative exhaustion do not apply in a § 145 proceeding."). Although preventing Disney from presenting evidence about what Levergood discloses with respect to the persistence of the SID, an issue that was

30

explicitly raised before the examiner but only implicitly if at
all to the Board during the prosecution of this application, may
be the better policy, it would be contrary to the Hyatt
decisions.  Therefore, Disney will be permitted to litigate the
issue of whether the SIDs in the Levergood patent are
persistent.

The USPTO's argument that Disney is "bound" by the
decisions it made during prosecution of the '772 application
before the USPTO is similarly unavailing.  When an applicant
does not present evidence to the USPTO due to "negligence or
lack of foresight," a disappointed applicant is nonetheless
"entitled to present his additional evidence to the District
Court." Hyatt II, 132 S. Ct. at 1702 (Sotomayor, J.,
concurring).  By implication, and because "the principles of
administrative exhaustion do not apply in a § 145 proceeding,"
id. at 1696 (majority opinion), an applicant's decision to
abandon one line of argument and the evidence supporting it
during administrative proceedings before the USPTO does not
limit his ability to present that evidence in a § 145
proceeding, at least absent any evidence of bad faith.  Instead,
according to the Supreme Court , "the proper means for the
district court to accord respect to the decisions of the [US]PTO
is through the court's broad discretion over the weight to be
given to evidence newly adduced in the § 145 proceedings." Id.

at 1700. Accordingly, the USPTO's arguments are better put to the weight rather than to the admissibility of Mr. Geller's expert opinions.

For these reasons, the USPTO's Motion for Partial Summary Judgment, or in the Alternative, for a Remand will be denied.

### III. CONCLUSION

For the reasons stated above, the defendant's Motion in Limine will be granted, both of the plaintiff's Motions in Limine will be denied, and the defendant's Motion for Partial Summary Judgment, or in the Alternative, for a Remand will be denied without prejudice by an appropriate Order to be issued with this Memorandum Opinion.

Entered this __11__ day of February, 2013.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge